LUTHER BEECHER v. JOHN DACEY, SR.

*" Orders" in payment for labor—Accommodation paper—Payment in paper.*

A mercantile firm delivered goods to the laborers of a mining corporation upon orders drawn in the following form: " [Date and number]. Due John Dacey, Sr., for labor, from the Marquette & Pacific Rolling Mill Company, four dollars, in goods, at the store of E. H. Mead & Co. $4.00. W. W. Wheaton, Treasurer, by C. S. W. Rice:" and on delivery of goods to the amount so called for, the firm stamped each order "paid." It was apparently understood that the firm should receive and honor the orders of the corporation, and that the latter should settle with it every month and pay the amount of the orders taken by it. The firm became insolvent and had among its assets a large number of these orders, on which suits were brought as for labor debts, and for the use of the persons to whom the orders were drawn, against one of the stockholders of the corporation. *Held,* that these actions would not lie; that the orders could not be treated as having been merely assigned to the firm by those in whose favor they were drawn; and that the use of the words "for labor" in the orders was simply to indicate the nature of the service for which they were given, and not to keep them alive as against stockholders.

A corporation organized for mining purposes would have no authority to issue accommodation paper and deliver it to strangers.

Where a corporation gives its paper to a firm which holds orders issued by it, payable in goods, and there is no evidence that the paper was given or received in payment of the orders, the transfer of the paper must be held to be no payment.

Paper given to be applied upon a debt cannot be considered as accommodation paper.

Error to Marquette.   Submitted October 20 and 21, 1880. Decided January 5, 1881.

ASSUMPSIT.   Defendant brings error.   Reversed.

*Atkinson & Atkinson, J. P. Whittemore, F. A. Baker* and *H. M. Cheever* for plaintiff in error.  The receipt of goods upon the labor certificates in this case discharged the claim for labor (*Shepard v. Cross* 33 Mich. 96), and the certificates were mere requests to deliver goods on the credit of the corporation which gave them (Morse on Banking, 30 ;

*Mandeville v. Union Bank* 9 Cr. 9; *Thatcher v. Bank* 5 Sandf. 121; *Griffin v. Rice* 1 Hilt. 184), and not due-bills of the corporation: *Vance v. Bloomer* 20 Wend. 199; *Lobdell v. Hopkins* 5 Cow. 516.

*Griffin & Dickinson* for defendant in error.

MARSTON, C. J. This is a test case, as a number of similar cases in all essentials await the result in this. Considering the character and importance of the questions raised, and the amount involved, the case becomes one of more than ordinary importance, and demands careful consideration.

The discussion in this court was able and exhaustive, and although quite a number of interesting questions were presented, yet in our opinion the case must ultimately be disposed of upon the legal construction of the labor certificates, so-called, that were issued, in view of the undisputed fact that Mead & Co. delivered goods thereon to the holders thereof. To pass by this question at the present time, or leave the proper construction of the certificates a matter of doubt or uncertainty, would be but to prolong needless litigation at great expense to all parties; and this should be avoided, especially where the case must inevitably reach a stage where the question could no longer be evaded.

The legal effect of the certificates, construed in the light of certain indisputable facts, must determine the respective rights of these parties.

The plaintiff below, John Dacey, Sr., was employed by and performed services as a laborer for the Marquette & Pacific Rolling Mill Company, a corporation, during the years 1876–7. Certain certificates were regularly issued to him, from time to time, all of which were in the following form, except as to the number, date, and amount.

"No. 4585. MARQUETTE, Dec. 14, 1876.

"Due John Dacey, Sr., for labor, from the Marquette & Pacific Rolling Mill Company, four dollars, in goods, at the store of E. H. Mead & Co.

"$4. W. W. WHEATON, Treasurer.
"By C. S. W. RICE."

Wheaton was treasurer and general agent of the corporation from the spring of 1873 up to December, 1877. The firm of Mead & Co. was organized in June, 1876, and was composed of E. H. Mead, and John Scudder, who was secretary of the Rolling Mill Company, as general partners, and Mrs. W. W. Wheaton as a special partner.

Certificates of the same form as the above were given other laborers of the corporation, to an amount aggregating upwards of eighty thousand dollars, which Mead & Co. received and delivered goods on to the full value thereof. The firm of Mead & Co. ceased to do business in August, 1878, at which time they made a general assignment for the benefit of their creditors; and certificates then in the possession of Mead & Co. to the amount of some fifty thousand dollars, passed in some way under the control of their creditors, and this action is brought for their use and benefit. In this action it is sought to hold Beecher, one of the stockholders of the corporation, liable as for a labor debt.

The firm of Mead & Co. did not at any time have any goods or funds on hand, or at their store, belonging to the Rolling Mill Company, and it was claimed on the trial, and Mead, Scudder and Wheaton so testified, that no agreement existed or was ever entered into between Mead & Co. and the Rolling Mill Company, under which the firm was to pay these certificates in goods or otherwise. It was shown that the Rolling Mill Company had no credit for goods or commercial credit in Marquette, where Mead and Co's. store was located, but that it was heavily in debt, which was well known to Mead & Co. That Mead & Co. advanced Dacey goods on the strength of his labor debt, or claim for labor against the corporation, knowing that the corporation stockholders were legally liable therefor and pecuniarily responsible.

These certificates were from time to time presented at the store of Mead & Co. by the holders thereof, and usually goods to the full amount thereof delivered thereon; if not, a store due-bill for the difference would be given the person presenting the certificate, which would be redeemed in goods

on presentation, and on receipt of each certificate by Mead & Co. they would stamp in red ink across the face thereof the word "Paid." This they testify was done to prevent the re-presentation of the certificates in case of their loss.

If a laborer desired goods, and had no certificate, or store due-bill, and goods were given him, they would be charged him on their books, and on afterwards delivering them a certificate for the amount thereof, such charge would be marked paid. Goods delivered upon certificates were not charged to the persons named therein, but were credited to merchandise, and the certificates charged to the Rolling Mill Company.

To show still more clearly the surrounding circumstances and the practical construction placed upon these certificates by the parties, and especially as it was claimed that no agreement existed under which these orders were to be so drawn and taken by Mead & Co., we will quote from the testi- mony of the plaintiffs' witnesses at some length, as all the testimony is given in the bill of exceptions.

Mr. Wheaton, the treasurer and general agent of the corporation, was examined as follows:

Q. Will you state whether you made any arrangement, or whether there was any arrangement with Mead & Company, by which Mead & Company should give the company credit for the goods given to laborers? A. There was no arrangement of that kind made.

E. H. Mead was examined and testified as follows:

Q. Will you state whether the Marquette & Pacific Rolling Mill Company had any arrangement of any kind with E. H. Mead & Co. whereby Mead & Co. should give goods to their laborers, and charge them to the company? A. No.

In this connection it may be proper to say that Mead also testified: "Dacey asked me, and I trusted him for goods, and took his labor certificate, knowing that the stockholders of the company were good, not trusting the company."

John Scudder was examined and gave testimony as follows:

In speaking of certain entries made upon the books of

Mead & Co. showing a monthly settlement and surrender of certificates, which will again be referred to, he testified:

"All the entries were made this way, with the understanding that Wheaton was to settle once a month with E. H. Mead & Co. and when he failed to do that, these due-bills were not given up."    *    *    *    "I made the entry with the understanding that Wheaton was going to take up these due-bills once a month; and when the end of the month came, I made the entry as if the due-bill would be given up; and they would be, provided he would take them."    *    *    *    *Question.* Didn't you say that Mr. Wheaton was to settle with you once a month on behalf of the Marquette & Pacific Rolling Mill Company? *Answer.* Yes, sir; he was to settle with Mead & Co. *Q.* When I say 'you' I mean, Mead & Co. Was that the agreement? *A.* That was the understanding."    *    *    *    *Q.* You say you talked it over with Wheaton. Give us the details of that agreement with Wheaton, on behalf of the Marquette & Pacific Rolling Mill Company, to pay these orders, take care of them. What was the agreement? *A.* The agreement was that Wheaton was to pay cash for all accounts, that is, for all goods that the Marquette & Pacific Rolling Mill Company got for its own use as well as these certificates. *Q.* The agreement was cash in this instance—nothing else? *A.* Yes, sir, cash. *Q.* Weren't they settled at the end of the month? *A.* Not quite at the end of the month but to make a monthly settlement. *Q.* In other words, the agreement was that at the end of the month, or when the month came around, that they would pay cash, and take up these orders and due-bills, and pay also for what goods they had themselves? *A.* Yes, sir. *Q.* And wasn't it under this arrangement that you went on and accepted these certificates or due-bills and paid goods out on them? *A.* I think it was. *Q.* You know it was, don't you? *A.* Knowing that the certificates were good. *Q.* You knew the Marquette & Pacific Rolling Mill Company were perfectly good? *A.* I knew the Marquette & Pacific Rolling Mill Company were not good. *Q.* But you knew Marquette & Pacific certificates were good? *A.* I knew the stockholders were good."

This is all the direct evidence we have touching the fact whether there was an agreement or not. The orders upon their face would imply an agreement of some kind, as it would seem highly improbable that they would be drawn in

such manner in the absence of some understanding in the first instance. But the practice at first was strictly in accordance with such an agreement, except perhaps as to the full payment being made in cash. And the books of Mead & Co. in reference to their dealings for 1876 show that they had received from Mr. Wheaton for the Rolling Mill Company, cash, notes and drafts, sufficient to balance the amount of orders, due-bills and certificates received by Mead & Co., and their books were in that way balanced. In this connection Mr. Scudder also testified that although the books were so balanced, their claim was not considered paid, and the certificates were not all surrendered. So monthly statements were made upon their books, showing a surrender of the certificates after 1876, but subsequently changed.

It also appeared, and was not controverted, that the total amount of labor certificates taken by Mead & Co. was upwards of eighty thousand dollars; that they also had other claims against the Rolling Mill Company; that they received from the Rolling Mill Company over thirty-five thousand dollars in cash, and over sixty-eight thousand dollars of the paper of the Marquette & Pacific Rolling Mill Company, which if paid would have left a balance due Mead & Co. of less than two thousand dollars.

Of the paper of the Rolling Mill Company some was used and some was not, and a large amount was afterwards returned; all that had not been used was returned, some of it having been held but a day or two; some that had been used was returned, and some used was to be returned, so as to leave the balance against the corporation about fifty thousand dollars.

In case of doubt as to the proper construction of the certificates, it becomes the duty of the court to construe them in the light of the surrounding circumstances and of the practical construction given by the parties, by their course of dealing, and certainly in so far as the facts were undisputed there was nothing to submit to the jury.

The controversy after all was not so much upon the facts as the legal effect thereof. There was no controversy as to

the form of the certificates or the total amount issued and taken by Mead & Co., or as to the amount of cash and paper of the corporation paid to or received by Mead & Co., or as to the manner in which they kept their books in the main, or as to the returns of a large amount of the paper of the Rolling Mill Company. Whether the paper of the corporation was given to and received by Mead & Co. in payment of these certificates, or on account thereof, or merely as accommodation paper, was controverted, and we may as well dispose of this part of the case here as at any other time.

This paper was not given or received as payment of the certificates : there is no evidence showing that it was, and in the absence thereof it must be held no payment. It is equally clear that it was not given as mere accommodation paper, within the customary meaning of that term. A corporation organized for mining and manufacturing purposes would have no authority to issue and deliver to third parties accommodation paper, and we cannot attribute any such unauthorized dealings to these officers, so long as a legitimate reason is apparent.

That there was an agreement made in the first instance, that certificates should be issued payable in goods at Mead & Co.'s store ; that they were to deliver goods thereon, and that the corporation should settle with them monthly and pay the amount thereof, can scarcely be said to admit of any doubt or question. That the corporation failed to make such cash payments is equally clear; and that in lieu thereof it gave its paper to Mead & Co. is also beyond controversy, but such paper was given upon and because of the claims held by Mead & Co. It was given to them so they might use it, and to this extent was a benefit or accommodation to that firm, but because of the debt of the corporation upon which it was given and to be applied if paid, it was not what is known as accommodation paper.

The agreement entered into and course of dealing thus far referred to would indicate pretty clearly that Mead & Co. did look to the corporation for the payment of these certificates, and not exclusively to the stockholders. The fact that

there was no formal assignment of these certificates, or of the labor debt, also tends strongly in the same direction. It would be almost incredible to suppose that Mead & Co. possessing, as we may fairly presume, ordinary business prudence and sagacity, would take over eighty thousand dollars in claims against an insolvent corporation, intending to rely upon their right and ability as assignees thereof to collect from the stockholders, and yet have taken no formal assignment.

In this connection the written agreement of January 4, 1878, a copy of which is given below, should not be overlooked. It is true the evidence is that this agreement did not go. into effect because never delivered, but whether delivered or not, the terms thereof were understood, so that it did not misrepresent the parties thereto, to say the least.

By this agreement the corporation was to deliver one hundred tons of ore "for each and every seventy-five dollars of due-bills, *payable in goods at their store* in Negaunee or Marquette, issued by W. W. Wheaton, treasurer, *in payment for labor at said Rolling Mill mine*, and taken up and *paid* by said E. H. Mead & Co. during the months of January, February, March and April, 1878."

The corporation was also after the opening of navigation to deliver a like quantity of ore for a similar amount "of such due-bills taken up and paid by them thereafter, until enough ore shall be delivered to pay said due-bills, *and other labor due-bills* of the said party of the first part, held by the said E. H. Mead & Co."

This indicates pretty clearly that even at the date of this agreement the parties understood that the laborers had been paid in goods, and that Mead & Co. looked to the corporation. And this undoubtedly was the understanding from the first. The orders as taken by Mead & Co. were marked "paid." There is no doubt that thus marking them paid would prevent a re-presentation thereof, had they been lost, yet this is hardly the word that would have been used for such purpose alone, especially where the order was not for any purpose to be considered as paid.

If, therefore, we look at all the facts and circumstances, and in the light thereof give a construction to these certificates, we can come to no conclusion favorable to the plaintiff's right to recover in the present action.

Let us however look at the order. It is not merely evidence of indebtedness given by the corporation : it is more than this. Nor is it a general order that might be taken to any store and traded off for goods; nor is it a general order payable in a particular way, from a fund owned or controlled by the corporation, or in goods owned by it, but is an order upon a certain firm to be honored in a particular manner. It may be a matter of some doubt whether if these certificates had been presented at any other store and goods delivered thereon, the parties taking them could have had any claim against the corporation, without at least showing that Mead & Co. had refused to honor them.

These certificates are orders upon Mead & Co. to deliver goods to the amount specified to the holders thereof, the persons named therein. Dacey after accepting such a certificate, until after a demand for the goods and refusal, could not have sued the corporation and recovered the amount thereof ; and on receiving the goods upon such certificates, Mead & Co. would have no claim therefor upon Dacey, and Dacey none against the corporation for his wages. In so far as Dacey was concerned, on receiving the goods his claim against the corporation became extinguished ; it was paid as provided for in the order he had received and used.

Was there an assignment by Dacey to Mead & Co., and if so of what ? Take John Dacey's testimony :

*Question.* " State to the jury what the arrangement was, if any, with Mr. Mead. *Answer.* He told me he would collect the money and I told him YES. *Q.* Collect the money for what ? *A.* For the goods he had given them. *Q.* What arrangement, if any, was made with reference to the labor debt which was due you; what was said between you and Mr. Mead there at the time you first went there to trade about the labor debt due from the company? *A.* He asked me would he collect the money. I said YES, you have a right to collect the money. It is your place to collect the money. I

know you will get it and it is stopped from me in the office. He took the due-bill from me and then gave me the stuff, and that is all I have to say about it."

C. H. Mead testified as follows:

*Question.* " State the circumstances under which Mead & Co. advanced goods to John Dacey, Sr.? *Answer.* I advanced him goods on the strength of the labor debt. *Q.* Will you state what took place? *A.* Mr. Dacey came into my store with a labor certificate, and wished to purchase goods, and I asked him if I should collect that. Dacey asked me, and I trusted him for goods, knowing that the stockholders of the company were good, not trusting the company. *Q.* Did you have any authority from Dacey to collect the debt of the company? *A.* Mr. Dacey authorized me to collect the debt against the stockholders, or whoever I had a mind to."

Again, when speaking of Dacey bringing the first certificate to the store, and asking for goods, he is asked

*Question.* " What else did he say in relation to that transaction? *Answer.* He told me to collect it. *Q.* Is that all? *A.* I asked him whom I should collect it of. *Q.* What did he say? *A.* Of the company, stockholders or anybody I had a mind to. I think he used some such words. *Q.* This is the substance of the words he used? *A.* Something to that effect."

Taking all this testimony together, and it is all there is that can possibly be claimed to have any tendency to show an assignment, and can it fairly be said to tend to show an assignment of a labor debt against a stockholder?

Bearing in mind the fact that this certificate was an order from the corporation to Mead & Co. to pay or deliver to Dacey goods to the amount specified therein, and the question of an assignment assumes a somewhat different aspect. Dacey presented the order at the place and to the firm where it was intended to be available to him. Mead & Co. could honor it or decline to deliver any goods thereon. But could they deliver goods thereon as requested by the corporation, and at the same time, enter into a new agreement with the holder thereof, thereby creating another and different liability, one not contemplated by the corporation issuing it?

We are clearly of the opinion they could not. To hold that they could, would enable them to pay an order in accordance with the terms thereof, and at the same time create a new and enlarged liability thereon in their favor. This would operate as a direct fraud upon the stockholders. It would enable Mead & Co. to accumulate orders, which upon their face would indicate a payment to the laborer, while in fact there was no payment to him but a purchase of his claim against the surety of his principal. The corporation, in issuing these certificates, with knowledge that Mead & Co. were delivering goods thereon according to the terms thereof, could not have intended, or supposed, the stockholders would be held liable thereon.

We place no particular significance on the words "for labor" in the certificates. They were not in our opinion inserted for the purpose of giving currency or adding value to the certificates, or to keep alive the claim for labor against the stockholders, but as indicating the kind of service performed by the person named therein—distinguishing it from services of a different kind or for property purchased, and to enable the corporation to properly keep its accounts. To hold that these words were inserted for the purpose now claimed, would be to charge the treasurer and general agent of the corporation with issuing these certificates in this form, in contemplation of the fact that the corporation would not pay them ; that they would accumulate in the hands of Mead & Co. who as assignees thereof would enforce them against the stockholders, and yet the stockholders would have no notice thereof, while an inspection of the orders and books of Mead & Co. would show directly the contrary. Surely a fraud of this character foreseen and deliberately planned and put in force by an officer of a corporation, whose duty it was to protect the stockholders by the payment of such debts by the corporation, and to see that they were not misled to their prejudice by false appearances, should not be charged against the treasurer of the Marquette & Pacific Rolling Mill Company. Not even the remote interest he may have had in the success of the firm of Mead

& Co. would justify an assumption of such extraordinary conduct on his part.

Against a course of dealing such as is relied upon in this case, the stockholders would be utterly unable to protect themselves. An examination of the books of the corporation would show that orders had been issued to the laborers; the orders would show that they were to be paid in goods by a firm therein named; following up the inquiry, an examination of the orders received by such firm would show them with the word "paid" stamped thereon; their books would show their merchandise account credited with the goods delivered on the orders, and the orders charged to the corporation issuing them; a monthly settlement of accounts, and a receipt in cash, drafts and notes of the corporation, to almost the full amount of the orders received. The changes made in their books and paper returned were too late in point of time. to have afforded the stockholders any protection even if brought home to them.

It follows from what has been said that the judgment must be reversed with costs, and under technical rules which give us no discretion a new trial must be. ordered.

The other Justices concurred.